UNITED STATES of America ex
rel Alva BETTIS, Plaintiff,

v.

ODEBRECHT CONTRACTORS
OF CALIFORNIA, INC. et
al., Defendants.

No. CIV.A.99–2879(ESH).

United States District Court,
District of Columbia.

Jan. 28, 2004.

Herbert Vincent McKnight, Jr., Altomease Rucker Kennedy, Ashcraft & Gerel, Washington, DC, for Plaintiff.

Niki Kuckes, Ryan E. Bull, Samuel J. Waldon, Baker Botts, LLP, Washington, DC, for Defendants.

Rudolph Contreras, U.S. Attorney's Office, Washington, DC, for Movant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Before the Court are cross motions for summary judgment regarding plaintiff/relator Alva Bettis' ("Relator") Fourth Amended Complaint, a *qui tam* action seeking damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 ("FCA").[1] Defendant Odebrecht Contractors of California, Inc. ("OCC") moves for summary judgment as to all counts, while relator seeks summary judgment as to the first count only.

## BACKGROUND

### I. Procedural History

Relator's allegations stem from a government contract involving a multi-million dollar construction project that spanned a six-year period. The Army Corp of Engineers ("COE") issued invitations for bid on March 1, 1993, for the construction of the Seven Oaks Dam and Appurtenance in San Bernardino County, California. Defendant CBPO of America ("CBPO"), a construction company, was ultimately awarded the Seven Oaks contract. CBPO also committed the resources of its affiliates, Odebrecht S.A. of Brazil and Odebrecht Contractors of California ("OCC") to this project. (Fourth Am. Compl. ["Compl."] ¶ 20.)[2]

---

1. In a *qui tam* action under the FCA, a private individual is permitted to bring suit in the government's name and by that means to share in the ultimate recovery. Such an individual is known as a "relator." *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 545–46 (D.C.Cir.2002).

2. Although only OCC has been served, its motion for summary judgment is applicable to all defendants that have been named in the complaint. (Defendant's Motion for Summary Judgment ["Def.'s S.J. Mot."] at 1 n. 1.) Even though CBPO was the entity that submitted the bid and performed the work, the defendants will be collectively referred to as

COE also contracted with Black and Veatch Consultants ("B & V") to monitor the dam's progress. Beginning in April 1995 relator was employed by CCL Construction Consultants, Inc. as a project scheduler to assist B & V in fulfilling a contract with COE for the Seven Oaks Dam project. (Def.'s Statement of Material Facts on Which There is No Dispute ["Def.'s Stmt."] ¶ 10.) Mr. Bettis was terminated from the project in 1998 by B & V. (Def.'s S.J. Mot. Tab 9 [King Decl.] ¶ 11.)

In 1999 relator commenced this suit under seal, claiming that defendants had violated the FCA. After the government declined to intervene on October 30, 2000,[3] this Court ordered, on November 1, 2000, that the complaint be unsealed and served on defendants. Relator filed a Third Amended Complaint in June 2002. In this complaint relator claimed that defendants violated the FCA by submitting an intentionally low bid, intending to seek modifications at a later date (Count I); submitting false claims for payment in months when they had received failing grades on required monthly schedules (Count II); engaging in a pattern of submitting requests for payments based on intentionally wrong measurements (Count III); seeking modifications based on false statements concerning the nature and extent of the conditions in the field and the need for the work (Count IV); submitting false statements while performing several construction projects (Count V); improperly charging the government for the cost of delays that defendants had caused (Count VI); and retaliating against relator by influencing his employer's decision to discharge

him in violation of 31 U.S.C. § 3730(h) (Count VII).

In response, defendant moved to dismiss, and on October 24, 2002, this Court issued a Memorandum Opinion and Order dismissing Counts II and VII of the Third Amended Complaint with prejudice and Counts I and V without prejudice, but denying defendant's motion as to Counts III, IV and VI. (*See* Memorandum Opinion ["Mem. Op."], Civ. Action No. 99–2879 (D.D.C. Oct. 24, 2002).) Thereafter, on January 23, 2003, relator filed a Fourth Amended Complaint in which he re-alleged Counts III, IV, and VI and amended Counts I and V. The Complaint now alleges that defendant violated the FCA by intentionally submitting a low bid, intending to seek false modifications in the future, and then submitting false modifications (Count I); intentionally submitting false survey data in support of progress payments (Count III); making false claims in connection with its excavation of the right abutment of the dam (Counts IV and VI); and making false claims in connection with its construction of the Intake Structure Access Road (Count V).

Upon completion of discovery, the parties moved for summary judgment. Plaintiff seeks judgment as to liability only under Count I. Defendant has moved for summary judgment as to all counts arguing that the evidence is insufficient as a matter of law to justify a finding of liability under the FCA, because plaintiff has failed to adduce any evidence that: (1) OCC fraudulently induced COE to enter into the contract or that OCC thereafter sought to increase the contract price through false modifications or adjustments (Count I);[4]

OCC throughout this opinion, since only OCC has been served.

3. The government declined to intervene in subsequent amended complaints as well.

4. Defendant has also argued that Count I should be dismissed because it is barred by the statute of limitations. Given the Court's resolution of defendant's other arguments, it need not reach this issue.

(2) OCC's monthly progress payment applications constituted false claims based on inaccurate survey data regarding the height of the face of the dam (Count III); or (3) the claims submitted for work relating to the right abutment or the Intake Structure Access Road were false (Counts IV, V and VI). In his opposition, plaintiff addresses defendant's arguments as to Counts I and III only. With respect to Count I, plaintiff concedes that certain contract modifications and concomitant increases in the contract price were due to design changes or COE's requests for additional work; he nonetheless argues that OCC knew from the outset that it could not perform the contract at its bid price; that it made knowing misrepresentations to COE to induce it to award the contract to OCC; that it fraudulently planned to seek monies from the government above and beyond the bid price; and that defendant received additional monies based on false claims for adjustments. (Pl.'s Opp. to Def.'s S.J. Mot. at 2–3 & n. 1.) With respect to Count III, plaintiff contends that defendant knowingly presented non-survey numbers to support pay estimates that were submitted to COE and thereby "knowingly presented figures to COE that were dishonestly inflated or which manifest a reckless disregard for the truth." (Id. at 30.)

Before addressing these arguments in detail, it is, however, necessary to begin by giving an overview of the facts that underlie this lawsuit, as well as the applicable law. Thereafter, the Court will turn to the cross motions as to Count I and then to defendant's motion as to Count III.[5]

## II. Factual Background

On March 1, 1993, COE solicited bid invitations for the construction of the Seven Oaks Dam project. This project included construction of an embankment dam that was to be 550 feet high; a cofferdam that was to be fifty feet high; excavation of a spillway approximately 550 feet wide and 1,400 feet long; completion of the outlet works and intake tower; installation of gates in the outlet tunnel; construction of approximately three miles of permanent access roads and two access bridges; and revegetation and hydroseeding of the work areas. (Compl.¶ 13.) Contractors were invited to submit bids for a fixed-price contract, with the price determined on a per-unit basis. In preparing the solicitation, COE divided the construction of the dam into 150 separate tasks, referred to as bid items. COE estimated the types and quantities of materials and labor needed to complete each bid item. (Def.'s Stmt. ¶ 1.) Each bidder was required to calculate a unit cost for each bid item, which was to include all direct and indirect costs and any profit. (Id.) The final price of each bid was calculated by multiplying the bidder's unit price by the quantity for each bid item. (Id. ¶ 2.) By submitting a bid, each bidder became legally obligated to complete the work, based on the project's specifications, for the unit prices set forth in its bid. (Id. ¶ 1.) The final bid price was, however, an estimate, which would vary depending on the actual quantities of material and labor required by the conditions in the field, since the actual cost of construction is calculated using actual quantities, not COE estimates. Thus, the

---

5. Except as discussed *infra* at note 38, the Court finds it unnecessary to address Counts IV, V and VI, for in his opposition, as well as his Response to Defendant's Statement of Material Facts On Which There Is No Dispute, plaintiff offers no contrary facts or legal arguments as to these counts, and obviously, his mere cross reference (*see* Pl.'s Opp. to Def.'s S.J. Mot. at 40 n. 5) to his responses to Requests for Admissions cannot satisfy the dictates of Fed.R.Civ.P. 56(e) and LCvR 56.1.

ultimate cost of the project would differ from the bid price if COE's quantity estimates did not prove to be accurate, but a bidder was bound by its unit prices and assumed the risk if these prices turned out to be too low. (*Id.* ¶¶ 1–2.)

After conducting pre-bid analyses, OCC submitted a $167,777,000 bid. (*Id.* ¶ 4.) The sealed bids were opened on July 7, 1993, and OCC's bid was the lowest, coming in almost $30 million below the second-lowest bid, which had been submitted by a joint venture involving Tutor–Saliba Corp., Perini Corp., and others ("Tutor–Saliba"), and more than $35 million below COE's cost estimate of $203,771,540. (*Id.* ¶ 5.)

Immediately thereafter Tutor–Saliba commenced a series of bid protests seeking to prevent OCC from being awarded the contract on the grounds that defendant's bid was unreasonably low. (*Id.* ¶ 7.)[6] Following the resolution of Tutor–Saliba's bid protest, COE awarded the contract to OCC on March 29, 1994. (*Id.* ¶ 8.) On April 20, 1994, COE issued to OCC a notice to proceed ("NTP") with construction. OCC began construction on the dam shortly thereafter.[7] (Def.'s Opp. Tab 4 [Price Decl.] ¶ 3.)

Construction of the dam consisted primarily of excavating materials from specified borrow areas via mechanical means or, when necessary, blasting; transporting the excavated materials to the dam site; processing materials to the required size and consistency if necessary; and placing materials in the appropriate zones of the dam.[8] The contract provided for monthly

progress payments, which were to be based on estimates of satisfactory work accomplished. (Def.'s S.J. Mot. Tab 17.) Because much of the work involved placing fill material into the dam's embankment, progress was estimated in part by using regular surveys of the height of the dam. (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶¶ 7–10.)

During the course of construction, defendant requested and received numerous equitable adjustments to the contract price. As plaintiff concedes, COE requested that OCC perform additional work that was not included in the original contract specifications amounting to at least $38,796,466.59. (Pl.'s Opp. to Def.'s S.J. Mot. at 2 n. 1.) In addition to COE design changes, as well as changes in the scope of work that were requested by COE, there were other equitable adjustments that were granted by COE over the life of the project. By the time that all outstanding disputes between OCC and COE were resolved, the government had paid $267,801,501 to OCC as of August 31, 2003, and although OCC had received $100,024,501 over its bid price, it nonetheless sustained a loss in excess of $30 million on the project. (Def.'s S.J. Mot. Tab 55 [Christiani Decl.] ¶ 2.)

## LEGAL ANALYSIS

### I. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affida-

---

**6.** The bid protest proceedings are described in the Court's prior Memorandum Opinion at 5–7.

**7.** As explained more fully *infra* at 288–90, construction on the cofferdam was delayed until April 1995 because Tudor–Saliba, which had been awarded a subcontract to build a

diversion tunnel, did not complete the project on time.

**8.** The dam's embankment is composed of multiple zones of material with differing sizes and geological characteristics, and each zone is identified by numeric or alpha-numeric names (*e.g.,* "Zone 3" or "Zone 4A").

vits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine, and should preclude summary judgment, if a reasonable jury could return a verdict in favor of the non-moving party. *Id.* at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989). However, the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987). The Court "must assume the truth of all statements proffered by the party opposing summary judgment," except for wholly conclusory statements unsupported by any competent evidence. *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C.Cir.1999); *Dickerson v. Sec-Tek, Inc.*, 238 F.Supp.2d 66, 73 (D.D.C. 2002).

## II. False Claims Act

The False Claims Act protects government funds and property from false or fraudulent claims. *Rainwater v. United States*, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). It provides liability for any person who

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a).

■ The Act's *mens rea* element does not require proof of a specific intent to defraud or deceive. § 3729(b); *see also United States v. TDC Mgmt. Corp., Inc.*, 24 F.3d 292, 298 (D.C.Cir.1994). Instead, a person acts knowingly when he or she: "(1) has *actual knowledge* of the information; (2) acts in *deliberate ignorance* of the truth or falsity of the information; or (3) acts in *reckless disregard* of the truth or falsity of the information." ·§ 3729(b) (emphasis added). In other words, the requisite intent is the "knowing presentation of what is known to be false." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991). "While a faulty estimate or opinion can qualify as a false statement where the speaker knows facts which would *preclude* such an opinion, the 'facts' ... are those that the speaking party could reasonably classify as true or false." *United States ex rel. Siewick v. Jamieson Science and Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C.Cir. 2000) (internal quotation marks and citation omitted.) However, innocent mistakes, negligence, and the common failings of scientists or engineers are insufficient. *Hindo v. Univ. of ·Health Sciences/ The Chicago Med. Sch.*, 65 F.3d 608, 613–14 (7th Cir.1995); *Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir.1992). "In short, ·the claim must be a lie" (*Hindo*, 65 F.3d at 613), and for a *qui tam* FCA action

to survive summary judgment, the relator must provide "sufficient evidence to support an inference of knowing fraud." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).

■ Nonetheless, not all false statements are actionable. Rather, there must be a claim "for payment or approval," and

> [a]s a result, only (i) actions which have the purpose and effect of causing the government to pay out money where it is not due, or (ii) actions which intentionally deprive the government of money it is lawfully owed, are considered claims within the meaning of the FCA.

*United States ex rel. Windsor v. DynCorp, Inc.*, 895 F.Supp. 844, 850 (E.D.Va.1995) (internal quotation marks and citations omitted). A "claim" is "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient." § 3729(c). But given the remedial nature of the statute, a submission need not be an actual invoice to be a "claim" or a "statement," for the statute reaches all fraudulent attempts to cause the government to pay out sums of money. *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C.Cir. 1995) (citing *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968)).

■ Once a false claim or statement in support of a false claim has been established, the Act provides for two types of liability.[9] First, statutory penalties may lie simply for submitting a false or fraudulent claim to the government, even if the government has suffered no loss as a result of the claim. *Schwedt*, 59 F.3d at 199; *accord Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n. 7 (4th Cir.1999) (*"Harrison I "*) ("there is no requirement that the government have suffered damages as a result of the fraud"); *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995) ("[i]ndeed, a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to pay out funds or to suffer any loss"). Second, the FCA provides for the recovery of *damages* if the government suffers a loss that was caused by the fraudulent claim or statement. *Schwedt*, 59 F.3d at 199; *United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir.1981) (finding that the government "must demonstrate the element of causation between the false statements and the loss" to recover FCA damages).[10]

## III. Count I

In his Motion for Partial Summary Judgment, plaintiff seeks summary judgment as to liability on Count I, which alleges that defendant fraudulently induced COE to award it the contract by submitting a low bid and that it never intended to perform at that price. In support of this claim of fraud-in-the-inducement, plaintiff argues that OCC made promises at the time that it submitted its

---

9. The statute provides that a person who knowingly submits a false claim or statement is liable to the government "for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains...." 31 U.S.C. § 3729(a).

10. Defendant is therefore incorrect in arguing that it is entitled to summary judgment because the alleged false statements did not result in any harm to the government. (*See, e.g.*, Def.'s Opp. to Pl.'s Mot. for Partial S.J. at 6–8.) While the lack of harm would preclude plaintiff from recovering damages, he could still recover statutory penalties if he could prove liability. *See, e.g.*, U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 922–23 (4th Cir.2003) (*"Harrison II "*).

bid regarding the cost-saving measures that it would use to accomplish the project,[11] and that it never intended to keep these promises; that OCC failed to perform quantity take-offs when preparing its bid, thus raising an inference of a fraudulent bid; and that OCC falsely reaffirmed its bid during the protest delay period despite its knowledge that its costs were escalating. Based on these alleged misrepresentations prior to OCC's commencement of work in April 1994, plaintiff argues that the facts support the inference that defendant fraudulently induced COE to enter into a contract and that defendant is liable as a matter of law under Count I. In response, defendant argues that plaintiff's evidence fails to satisfy the requirements of a fraud-in-the-inducement case since no reasonable jury could infer (1) that defendant fraudulently submitted a low bid in order to induce COE to award OCC the contract intending to seek monies later in excess of the contract price, or (2) that defendant in fact fraudulently sought monies in excess of the contract price by submitting false adjustments.

As explained below, plaintiff's position must be rejected, since it is wrong both as to the law and the facts. First, it is premised on a legally-flawed application of the fraud-in-the-inducement theory, and second, even assuming plaintiff's unjustifiably broad interpretation of the law could be accepted—which it cannot—the undisputed facts fail to support an inference of either fraud-in-the-inducement or the submission of false adjustments.

## A. Relator's Legal Theory

■ Relator's underlying theory in support of Count I has already been the subject of a prior opinion by this Court. In that Memorandum Opinion, the Court was confronted with the question of whether Count I of plaintiff's Third Amended Complaint could survive a motion to dismiss. In particular, plaintiff alleged that defendant submitted a bid that was "intentionally undervalued" with the goal of seeking subsequent modifications and adjustments to the contract price. (Third Am. Compl. ¶¶ 25–26.)

In addressing the legal sufficiency of this count, the Court discussed the relevant case law relating to fraud-in-the-inducement, including those cases where courts have held that when a contract is initially obtained through fraud or deception, every claim for payment submitted pursuant to that contract is thereby tainted and triggers FCA liability regardless of whether that claim is itself "false or fraudulent." (Mem. Op. at 10 (citing *Harrison I*, 176 F.3d at 787–88, *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 298 (D.D.C.1996), and *Schwedt*, 59 F.3d at 199 & n. 1 (identifying the theory without discussion because any such claim was found to have been waived).)) This theory finds its genesis in the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), where the Court held that claims submitted under a contract that had been obtained through collusive bidding (which inflated the contract price) were actionable. In that circumstance, as explained by the Court, the initial fraud "did not spend itself with the execution of the contract," but rather, it "entered into every swollen estimate which was the basic cause for payment of every dollar" paid by

---

**11.** Specifically, plaintiff claims that defendant promised to use a glory hole to excavate the dam's spillway area, two sets of four ten-hour shifts ("rolling four-tens") to eliminate overtime costs, and new equipment to save money through depreciation and increased utilization. *See infra* Section III(B)(1).

the government. *Id.* at 543, 63 S.Ct. 379.[12]

But in its Memorandum Opinion, this Court explicitly rejected the relator's argument that all subsequent claims for payment were automatically tainted by the fraudulently deflated bid on the grounds that it would be nonsensical and illogical to hold a defendant liable merely for underbidding a contract, even if at the time the bid had been submitted, the bidder knew or should have known that it could not perform at the original bid price and it intended to seek an increase at a later date. (Mem. Op. at 11–12.) In reaching this conclusion, the Court made it clear that this case could not be compared to those where at the time the bid had been submitted, the contractor either intentionally inflated its costs or submitted a collusive bid.[13] (*Id.*) In so holding, the Court observed that where the initial deception involves deflating the original contract price, there can be no liability for merely submitting a low bid with the intent to obtain additional monies unless the contractor in fact seeks adjustments beyond the bid price. (*Id.*)[14] Based on this analysis, the Court dismissed Count I without prejudice for failing to allege that defendant had in fact submitted a claim for payments in excess of its bid price. (*Id.* at 12–13).

In response to this ruling, plaintiff filed a Fourth Amended Complaint wherein he ostensibly cured this defect by alleging that defendant submitted requests for additional payments in excess of its bid price. (Compl.¶ 27.) Nonetheless, plaintiff continues to question, without citation or analysis, the Court's ruling by arguing that it was incorrect to require plaintiff to allege that the contractor submitted claims in excess of its bid price. (*See, e.g.,* Pl.'s Mot. for Partial S.J. at 34 n. 3, and Pl.'s Reply at 7 n. 1.) And more importantly, based on a misunderstanding of this Court's Memorandum Opinion and the relevant case law, plaintiff bases his motion for partial summary judgment, as well as his opposition to defendant's motion, on the flawed legal argument that he can prevail on a mere

---

**12.** *See also* the legislative history of the FCA, which suggests that "each and every claim submitted under a contract ... which was originally obtained by means of false statements or other corrupt or fraudulent conduct ... constitutes a false claim." S.Rep. No. 99–345, at 9 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5266,.5274 (citing *Hess* ).

**13.** *See, e.g., Harrison I,* 176 F.3d at 790–93 & n. 13 (contractor submitted false information to induce government into entering a subcontract under which it would pay more for services than it would have under the existing contract); *United States ex rel. Fallon v. Accudyne Corp.,* 880 F.Supp. 636, 638–40 (W.D.Wi.1995) (contractor submitted pricing information that falsely represented that it included environmental compliance costs); *United States v. Gen. Dynamics Corp.,* 19 F.3d 770, 772, 775 (2d Cir.1994) (defendant submitted inflated cost estimates in subcontract submitted for approval to government); *Hagood,* 929 F.2d at 1420–22 (contract was obtained based on false pricing information that would result in the federal government receiving less money under a water supply contract than it otherwise would have); *United States v. CFW Constr. Co., Inc.,* 649 F.Supp. 616, 618 (D.S.C.1986), *dismissed on other grounds,* 819 F.2d 1139 (4th Cir.1987) (bidrigging).

**14.** As stated in the Memorandum Opinion:

[I]t sweeps too broadly to conclude that *every* claim submitted under a contract obtained through a contractor's intentional underbidding is necessarily a false claim. The FCA should not be used to penalize a party for making claims for payment that seek less money than what the government would have been asked to pay if the allegedly fraudulent statement had never been made. Attaching liability in this context would only punish the contractor for having had illicit thoughts at the time of the bidding, rather than for doing what the text of the statute actually forbids: submitting demands for money to which it is not legitimately entitled.

*Id.* at 12.

showing that OCC fraudulently induced COE to enter into the contract by submitting a low bid intending to seek additional monies, and that defendant obtained monies above and beyond the contract price. (*See, e.g.,* Pl.'s Mot. for Partial S.J. at 32–34; Pl.'s Opp. to Def.'s S.J. Mot. at 3; and Pl.'s Reply at 3.) To the extent that plaintiff proceeds on this basis, he is again seeking to expand the fraud-in-the-inducement theory in a manner that is contrary to the purpose of the FCA, as well as flatly inconsistent with this Court's prior ruling.

As set forth in the Memorandum Opinion, it is contrary to the notion of competitive bidding and the FCA's goal of protecting the public fisc to punish a defendant for submitting a low bid even if the defendant knows or should have known that he cannot perform at that price. (Mem. Op. at 11–12.) For, as observed by the court in *United States v. Farina:*

> How has the Government been defrauded or how would it be defrauded by the mere receipt of a revised and predated bid which, if accepted, would cause the Government to expend less in payment of the undertaking proposed by the bid? It is not readily conceivable the Government would be damaged to its prejudice under that circumstance.
>
> In this connection, such is a decided distinguishing characteristic of this case, setting it apart form such cases as the *Hess* case wherein the defrauding consisted in collusive bidding that caused the Government to expend a greater sum in payment of work performed than it would have been required to pay had there been free competition in the open market.

153 F.Supp. 819, 822 (D.N.J.1957). *Cf. Chicago Coll. of Osteopathic Med. v. George A. Fuller, Co.,* 719 F.2d 1335, 1347–48 (7th Cir.1983) (finding that a low bid alone is insufficient to prove the element of knowledge required for common law fraud).

The fact that a deflated bid alone cannot suffice to impose liability under the FCA is not, however, cured by merely adding a claim that defendant sought monies above and beyond the bid price. Such a proposition completely ignores the reality of government contracting where it is common for a contract that was bid at one price to ultimately cost far more. For instance, as previously noted, in a unit-price contract, such as the Seven Oaks Dam contract, the final price will necessarily be different if the actual quantities of materials turn out to be greater than the government's original quantity estimates. Further, as plaintiff concedes (*see* Pl.'s Opp. to Def.'s S.J. Mot. at 2 n. 1), it is perfectly acceptable for the government to modify the scope of work or to change the design specifications. Alternatively, the final price can be increased if the government's representations about the nature of the project turn out to be inaccurate. Since there are a myriad of legitimate adjustments that can increase a contract price beyond the bid price, it necessarily follows that plaintiff cannot rest only on proof of a fraudulently induced contract by means of a low bid and an attempt by the bidder to obtain monies in excess of the bid price. Rather, there must be a claim "for money to which . . . [the contractor] is not *legitimately* entitled." (Mem. Op. at 12 & n. 7 (emphasis added).) *See also Windsor,* 895 F.Supp. at 850 (a claim within the meaning of the FCA must have "the purpose and effect of causing the government to pay out money *where it is not due*" (emphasis added) (internal quotation marks and citation omitted)); *United States v. Rivera,* 55 F.3d at 709–10 ("in deciding whether a given false statement is a claim or demand for payment, a court should look to see if, within the payment scheme, the statement

has the practical purpose and effect ... of inducing *wrongful* payment" (emphasis added)).[15]

In an attempt to avoid the requirement of proving that defendant sought money above the contract price that it was not otherwise entitled to, plaintiff, relying on various fraud-in-the-inducement cases, argues that if a contract is obtained by fraudulent means, it is void *ab initio*, and the government is entitled to a refund of its money on the theory that every claim has been tainted by the original fraud.[16] (*See, e.g.,* Pl.'s Reply at 4–6.) Such reliance is misplaced. First, many of the fraud-in-the-inducement cases cited by plaintiff involve collusive bidding, inflated prices or incorrect pricing information that resulted in claims being made on the government for monies that would not otherwise have been owed in the absence of fraud. *See supra* note 13. These cases are of no help to plaintiff unless he too can show that OCC sought monies that it was not otherwise entitled to. Second, the only other category of cases upon which plaintiff relies have been referred to "False Certification Cases" (*see Harrison I*, 176 F.3d at 786), where courts have applied the theory of fraud-in-the-inducement to situations where a false certification induced the government to enter into a contract even though the subsequent claims for payment themselves did not contain false statements. *See, e.g., Alexander*, 924 F.Supp. at 298 (contractor misrepresented its record of business ethics); *Harrison II*, 352 F.3d at 915–17 (false certifications regarding a lack of conflict of interest can result in FCA liability); *Harrison I*, 176 F.3d at 786–87. But as this Circuit has recognized, certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA *unless* payment is conditioned on that certification. *Siewick*, 214 F.3d at 1376 (rejecting theory of implied certification and requiring that the certification must be a prerequisite to obtaining a government benefit).

In each of the cases relied on by plaintiff, the government would either not have signed the contract or would have negotiated a lower price had it known the truth. Either way, the demands for payment furthered the original deceit by helping the wrongdoer obtain money from the government to which he would not otherwise be entitled. That is not the case where the fraud-in-the-inducement claim involves only a low bid and no attempt by the low bidder to obtain, via a false claim, monies to which he is not legitimately entitled.[17]

---

**15.** *See also* the Statement of Interest filed by the United States in this case on October 29, 2003, wherein it argues that not every false statement is actionable under the FCA, for "there must be a nexus between the falsity and the defendant's request for payment .... In other words, the falsehood must relate to the claimant's eligibility for payment with respect to the amounts paid." (*Id.* at 7.)

**16.** As discussed by the Court of Appeals for this Circuit in *Siewick*, the notion of a government contract that is void *ab initio* is fraught with analytical problems, especially where the government has declined, as is the case here, to join a relator's suit. 214 F.3d at 1377–78.

**17.** Significantly, plaintiff is unable to cite to *any* FCA case involving a claim of fraud-in-the-inducement based on a low bid and thus has no support for his novel attempt to stretch the fraud-in-the-inducement theory far beyond its recognized boundaries. The Court has discovered one case—*United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218 (D.Md.1995). There, a government contractor was charged with intentionally underbidding a contract in order to induce the government to sign the contract knowing that the project would cost more than the bid. However, the allegations did not stop there. The plaintiff also charged that the contractor planned on recouping the shortfall via a separate agreement under which the government paid the contractor to

Thus, to the extent that plaintiff's motion for partial summary judgment is premised on a theory that a contractor is liable under the FCA for fraudulently submitting a low bid and obtaining monies in excess of the contract price without regard to the legitimacy of those cost adjustments, it must be rejected as contrary to the case law, as well as inconsistent with the FCA's goal of protecting the government against false or fraudulent claims.

Moreover, even if plaintiff's fraud-in-the-inducement theory were not fatally flawed, plaintiff cannot survive defendant's challenge to Count I because the undisputed facts are insufficient to support a finding of liability under the FCA. First, with respect to OCC's conduct prior to commencing work on the contract, the facts upon which plaintiff relies do not permit an inference that defendant fraudulently induced COE to sign the contract by submitting a bid that it knew or should have known was false, intending to seek subsequent adjustments. And second, with respect to OCC's post-contract conduct, neither the law nor the facts permit an inference that any of the requests for adjustments that plaintiff has identified were false or fraudulent.

## B. Relator's Factual Claims Regarding Pre–Contract Conduct

█ In an attempt to support his claim that defendant fraudulently induced COE to award the contract to OCC, relator fo-cuses on three aspects of OCC's conduct relating to its submission and reaffirmation of its bid prior to commencement of work on the contract in April 1994, arguing that: (1) defendant made promises at the time it submitted its bid regarding cost-saving devices it never intended to use; (2) defendant failed to use quantity take-offs in calculating its bid; and (3) defendant falsely reaffirmed its bid during the protest delay period despite its knowledge that its costs and expenses were escalating. These claims will be considered *seriatim*.

### (1) Cost–Saving Devices

Defendant's bid contemplated the use of certain construction methods and means, including a glory hole, "rolling four-tens," and new equipment. According to relator, defendant intended to induce COE to sign the contract by promising to institute these cost-saving devices, knowing they would not be used. This position is riddled with both factual and legal problems.

Based on the undisputed facts, one cannot reasonably conclude that defendant proposed the use of these devices to fraudulently induce the government to enter into the contract, since the only reasonable inference is that at the time that defendant submitted its bid, it had every intent, as well as motivation, to use these cost-saving measures. First, defendant planned to use rolling four-tens, or two crews working rolling forty-hour weeks.[18] Defendant ac-

do research and development work unrelated to any specific contract. *Id.* at 221. The allegations that defendant "knowingly and intentionally [ ] billed work required under the [contract] to [research and development] for the purpose of winning the [contract] but recovering more than the contracted price" were found to be sufficient to stave off a motion to dismiss. *Id.* at 223.

The result in *Mayman* is consistent with the Court's analysis here that a fraudulently in-duced contract by means of a low bid is not enough; there must also be an intent to recover additional monies above the contract price, as well as the submission of claims for monies to which the contractor is not otherwise entitled.

18. The first shift of the first crew would work ten hours, then the second shift of the first crew would work ten hours. (Pl.'s Mot. for Partial S.J. Ex. 12 at 000554.) This would continue for four days, and then the first crew

tually utilized "rolling four-tens" throughout the first year of construction, until it determined that the process was unmanageable and too expensive. (Pl.'s Mot. for Partial S.J. Ex. 13 [Bakeman Dep.] at 29; Def.'s Reply Tab 1 [Relator Dep.] at 225.) Since defendant did in fact use rolling 4–10s for a year, relator's attempt to marginalize this fact by referring to a year as "a brief period" (Pl.'s Reply at 16) hardly advances plaintiff's point. The fact that defendant used this approach and then decided to jettison it is, if anything, inconsistent with the argument that defendant intended three years earlier, at the time it submitted its bid, not to use "rolling four-tens."

Similarly, relator's claim that defendant did not intend to utilize all new equipment is unpersuasive. Relator is correct that defendant utilized some used and rental equipment. But relator is not correct, for instance, in arguing that defendant employed a used conveyor system, since the undisputed evidence shows that the portion of used line in the conveyor system represented only 5,000 feet out of more than 7.5 miles of conveyor system at the dam. (Def.'s Opp. to Pl.'s Mot. for Partial S.J. Tab 2 [Bakeman Dep.] at 23–28.) Moreover, defendant did in fact employ substantial amounts of new equipment. (*Id.* at 16–18.) For example, only one of its Cat 777 dump trucks was used (*id.* at 16–17), and all of the "equipment to move and/or dig out" material was new. (*Id.* at 17.) But more importantly, defendant never promised to utilize *all* new equipment so it is impossible to argue that

defendant breached some promise regarding the type of equipment it would use.[19]

Relator's contention that defendant's failure to use a glory hole demonstrates that defendant never intended to do so is equally unavailing. To move materials at a construction site, relator proposed to use the "glory hole" technique, which would utilize a shaft, or ten-foot hole, through which earth and rock would be dropped down the mountain from the top of the excavation area onto a conveyor system below, and then transported to the dam. (Pl.'s Mot. for Partial S.J. Ex. 12 at 000555.) Contrary to its initial plan, defendant did not ultimately use a glory hole to excavate the spillway. However, the record indicates that for several years its construction plans included a glory hole.

For instance, the bid documents included detailed plans and pricing for use of the glory hole. (Def.'s Opp. to Pl.'s Mot. for Partial S.J. Tab 5 at 00347–00356.) At the time that OCC presented this concept to COE in July 1993, it believed that it would result in cost savings. (*Id.* Tab 7 [Chagas Dep.] at 45–46.) Even after the contract was signed, OCC still intended to use a glory hole as attested to by Richard Price, who was hired as a construction engineer in September 1994. (*Id.* Tab 4 [Price Decl.] ¶ 3.) In fact, Price supervised the drafting work at the spillway to determine where the vertical shaft of the glory hole could be placed and researched other projects where a glory hole had been used to assist in his own work. (*Id.* ¶ 10.)

However, despite these plans, the glory hole was rejected in the spring or early

---

would be off for four days while the second crew repeated the process. (*Id.*) Consequently, the construction would proceed for twenty hours per day, every day of the week, without incurring overtime costs. (Def.'s Opp. to Pl.'s Mot. for Partial S.J. Tab 1 [Relator Dep.] at 225.)

19. A preliminary equipment list indicates that defendant planned to use some used and some rented equipment. (Pl.'s Mot. for Partial S.J. Ex. 12 at 000557.) The list reflects that more than half the equipment would be new, with the rest purchased used or rented. (*Id.*)

summer of 1995 (*id.* ¶ 14), a year after construction of the dam had begun and almost two years after the defendant submitted its bid. Plaintiff takes issue with defendant's rationale for abandoning the glory hole [20] and makes much of the fact that several OCC employees did not know why the glory hole had been rejected. (Pl.'s Mot. for Partial S.J. at 12–14.) However, the value of this evidence is severely undercut by the fact that the employees identified by relator were not involved in the decision to abandon the glory hole, and with one exception (Jin Quin), they were not working at the project when that decision was made. (Pl.'s Mot. for Partial S.J. Ex. 18 [Huber Dep.] at 19 (Mr. Huber joined the project in April 1995, just as defendant was deciding not to use the glory hole); Ex. 22 [Quin Dep.] at 59–60; Def.'s Opp. to Pl.'s Mot. for Partial S.J. Tab 7 [Chagas Dep.] at 44, 47–48; Tab 12 [Spencer Dep.] at 162.) But more importantly, even if there is a dispute as to whether defendant had a valid reason for discontinuing its plan to use a glory hole, this is hardly probative of the defendant's intent two years earlier, especially given

the absence of any evidence to support the conclusion that at the time the bid was prepared, OCC lacked the intent to use a glory hole.

In addition to these glaring factual problems, plaintiff's attempt to support an inference of fraud-in-the-inducement based on the fact that defendant proposed, but did not use, certain cost-saving devices suffers from even more serious infirmities. For instance, even assuming that COE was influenced in some way by OCC's proposed innovative techniques,[21] the methods and means proposed by defendant cannot be analogized to "promises" for purposes of imposing liability under the FCA. (*See, e.g.,* Pl.'s Reply at 15.) It is undisputed that OCC was not contractually obligated to use any of these devices. Rather, defendant was free to use whatever means and methods it chose for the construction of the dam, and it could change its plans. (*See* Def.'s Opp. to Pl.'s Mot. for Partial S.J. Tab 1 [Relator Dep.] at 209–13.) In this regard, it also bears noting that defendant altered its planned methods at the dam with COE's full knowledge,[22] and no claim was ever filed

---

**20.** According to defendant, work at other areas of the dam revealed soil and other site conditions that rendered the hole impractical. (*Id.* ¶¶ 12–14; Pl.'s Mot. for Partial S.J. Ex. 5 at 22.) In response, plaintiff points to the testimony of Fritz Huber, who joined defendant on the Seven Oaks Dam project in April 1995 as production manager, to cast doubt on defendant's justification. According to Huber, reliance on differences in site or soil conditions was questionable because information derived from site conditions at other parts of the dam were, in his opinion, poor indicators of site conditions at the spillway where the glory hole was to be employed, and he was unaware of any new site analyses that should have given defendant any reason to change its plans. (*Id.* Ex. 18 [Huber Dep.] at 69–70, 73–74.)

**21.** Even this assumption is questionable given the evidence from COE that it "found the

post-bid, pre-award meeting between OCC and [COE] to be informative and reassuring, but they were not of significance to [COE's] decision to award the Dam contract to OCC." (Def.'s S.J. Mot. Tab 9 [King Decl.] ¶ 10.) *See generally Harrison II*, 352 F.3d at 916 (certification was material because it was a prerequisite to awarding the contract and it played an important role in the procurement process).

**22.** While the Court need not resolve the issue of whether the government's knowledge of a false claim renders the falsity immaterial under the FCA, it is undisputed that it is a circumstance that is relevant to determining whether defendant lacked the requisite *scienter*. *See, e.g., United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir.1993); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir.2002). (*See also*

with respect to any of the cost-saving devices to recoup monies that presumably were lost when OCC could not implement them.[23]

Finally, plaintiff's argument defies common sense. By agreeing to perform a fixed unit-priced contract, a contractor becomes legally obligated to complete the project at those prices regardless of the means and methods used or the costs thereof. (*See* Def.'s S.J. Mot. Tab 2 [Spencer Decl.] ¶ 4.) If a contractor misjudges the feasibility of using a particular cost-saving device, he cannot recoup his losses. Rather, if he must use different means and methods and if they cost more, the increased cost is borne by the contractor who assumed the risk of underestimation. (*Id.* Tab 4 [McKittrick Dep.] at 134–35.) It therefore makes absolutely no economic sense for a contractor to estimate its bid based on cost-saving devices that it does not intend to use given the probability that their non-use could have a serious negative effect on the profitability of the contract.

At best, OCC's representations regarding its intent to use various cost-saving devices and its later failure to use them proves only that OCC's bid analysis turned out to be deficient, not that it intended to defraud the government. If anything, OCC would have had every motivation to implement these techniques in order to maximize its profits. There is thus no factual or logical basis upon which to permit an inference of fraud.

### (2) Quantity Take–Offs

Relator next alleges that defendant failed to perform quantity take-offs in preparing its cost estimates as required by industry standards, and that as a result, the bid was false. This claim is also factually and legally flawed.

A quantity take-off is a detailed estimate of the quantity of each work item required by a contract. (Def.'s S.J. Mot. Tab 4 [McKittrick Dep.] at 17.) The parties do not dispute that performing quantity take-offs is a standard procedure used in preparing bids. (Def.'s Resp. to Pl.'s Stmt. ["Def.'s Resp."] ¶ 31.) While relator concedes that "[g]iving the defendant the benefit of the doubt, there is credible proof that take-offs were done" for at least 36 of the 150 bid items, he alleges that defendant failed to perform take-offs for several of the other bid items. (Pl.'s Mot. for Partial S.J. at 26.) Relator also claims that defendant used some of COE's quantity estimates in lieu of doing its own take-offs. (*Id.* at 26, 29–32.) From this, relator argues that defendant's chief estimator, Dan Spencer, "must have known that his bid proposal ran afoul of the standards he testified he practices," and that the proposal was not "accurate and dependable." (*Id.* at 40.) And then, without any support, plaintiff leaps to the conclusion that the bid was fraudulent.

The facts, however, do not support an inference that the bid was knowingly false or fraudulent. Mr. Spencer testified that he knew take-offs were done. (Pl.'s Mot. for Partial S.J. Ex. 25 [Spencer Dep.] at 23.) Relator disputes this fact, alleging that other statements by Mr. Spencer cast doubt on it. (Pl.'s Mot. for Partial S.J. at

---

Pl.'s Opp. to Def.'s Mot. for S.J. at 33–35; United States' Statement of Interest at 3–4 and cases cited therein.)

**23.** Of course, to succeed on a fraud-in-the-inducement theory, plaintiff need not show that the false claim was related directly to the misrepresentation that supposedly induced the government to enter into the contract, but it is certainly significant that the defendant never sought any additional monies as a result of not using the cost-saving devices that are at issue here.

28–30). For example, he points out that Mr. Spencer relied on his subordinates to actually perform the calculations, a practice that relator's expert acknowledges is common. (*Id.*) He also alleges that COE quantity estimates were used in place of defendant's own in some circumstances. (*Id.* at 28–30.) And, relator relies on testimony of an OCC employee who began work in July 1994 after construction began and was assigned to measure quantities for the dam but found no quantity take-offs against which to compare his measurements. (*Id.* at 30.) But even assuming that Mr. Spencer relied on subordinates, that he used some of COE's estimates instead of doing his own, and that quantity take-offs were not available for post-bid comparisons, it does not follow that the bid was false. At most, this would demonstrate that defendant failed to conform to an industry standard for producing an accurate estimate, which is not actionable under the FCA. *United States ex rel. Mikes v. Straus,* 84 F.Supp.2d 427, 432–33 (S.D.N.Y.1999); *Luckey v. Baxter Healthcare Corp.,* 2 F.Supp.2d 1034, 1047 (N.D.Ill.1998) ("Courts have consistently declined to find that a contractor's exercise of scientific or professional judgment as to an applicable standard of care falls within the scope of the FCA."), *aff'd,* 183 F.3d 730 (7th Cir.1999).

Relator tries to salvage his argument by citing *Harrison I* for the proposition that defendant's estimates can create FCA liability. (Pl.'s Mot. for Partial S.J. at 40.) *Harrison I* teaches that "an opinion or estimate carries with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." 176 F.3d at 792 (internal quotation marks and citation omitted) (fraud may only be found in expressions of fact that may be adjudged true or false in a way that admits of empirical verification).

Relator argues that Mr. Spencer "must have known that his bid proposal ran afoul" of industry standards. (Pl.'s Mot. for Partial S.J. at 40.) But even if Mr. Spencer knew this, how does that establish that OCC's bid was fraudulent?

Finally, plaintiff's argument suffers from the same illogic as his claim with respect to the cost-savings devices. It would be contrary to a contractor's interest in maximizing his profits to prepare a fraudulently low bid that understates his per unit costs given the uncertainty of ever recouping those costs. Faced with the probability of bearing the loss of understating per unit costs, why would a contractor knowingly, as opposed to negligently, fail to follow industry practices for preparing a bid? Second, there was no contractual obligation or promise to follow certain procedures in preparing the bid, and there is no allegation that any subsequent claim for extra money was made to recoup any losses attributable to the failure to perform quantity take-offs. Thus, even if one accepts relator's factual assertions as undisputed, the failure to use quantity take-offs does not support an inference of fraud-in-the-inducement.

### (3) Bid Reaffirmation During Protest and Related Delay Costs

Relator also contends that defendant fraudulently reaffirmed its bid during the protest period when defendant knew or should have known that its costs were rising. And second, relator claims that defendant illegitimately sought an equitable adjustment to cover its increased pre-award costs. Before addressing relator's arguments, a brief account of the events surrounding the bid reaffirmation and request for adjustment is necessary.

Relator's allegations stem from a delay in the start of construction. Immediately

after the bids were unsealed in July 1993, the second-lowest bidder, Tutor–Saliba, commenced a series of protests to prevent defendant from being awarded the contract. (Def.'s S.J. Mot. Tab 9 [King Decl.] ¶ 12.) While this bid protest was pending, defendant agreed to extend the period during which COE would be able to accept defendant's bid. (Pl.'s Mot. for Partial S.J. Ex. 30 at 000800.) COE's invitation for bids was silent as to which party was responsible for schedule impacts and costs if the notice to proceed was issued later than the anticipated date. (Def.'s Mot. Tab 9, Ex. 11 at 000315.)

Another event happening during this time also proved relevant to the delay. Under the contract, defendant was required to construct the cofferdam between April 1, 1994 and October 1, 1994. (Id. Tab 26.) This was necessary, since this time period was considered the dry season, which is the only time during which the cofferdam could be constructed. (Def.'s Stmt. ¶ 18.) Under a previous, unrelated contract, Tutor–Saliba had agreed to construct a diversion tunnel, which was to divert the Santa Ana River to aid in cofferdam construction. (Def.'s S.J. Mot. Tab 9 [King Decl.] ¶ 13). Cofferdam construction could not begin until the diversion tunnel was finished (Def.'s Stmt. ¶ 17), because certain intake and portal areas would not be available until then. (Def.'s S.J. Mot. Tab 26.) The diversion tunnel was scheduled to be completed on June 1, 1993 [24]—well before defendant's contract was scheduled to begin. (Id. Tab 9, Ex. 7 [Judge Gomez's Advisory Opinion ("Advisory Op.")] ¶ 18.) However, Tutor–Saliba did not finish until July 23, 1994. (Id.) Accordingly, the diversion tunnel delay began well before the bid protest and extend-

ed until July 1994, beyond the contract award. (Id.)

On April 7, 1994, after defendant was awarded the contract but prior to the issuance of the NTP, defendant notified COE of its concern that further delays to the commencement of the project would negatively impact its timeline and costs. (Id. Tab 21.) After COE issued the NTP, and in response to defendant's communication in May 1994, COE extended interim deadlines by 207 days, an amount of time equal to the bid protest delay. (Id. Tab 9, Ex. 4.)

On April 24, 1994, defendant requested that the project schedule be extended an additional 158 days, which would return it to the seasonal schedule set forth in COE's solicitation, but one year later. (Id. Tab 22.) In other words, the cofferdam construction would take place from April 1 through October 1, 1995, as opposed to the same time one year earlier. Defendant made this request as a result of Tutor–Saliba's delay in completing the diversion tunnel and the impossibility of construction during the rainy season.

On June 10, 1994, defendant also filed a Request For An Equitable Adjustment ("REA") in the amount of $7,900,000 for escalation of costs, six months of unabsorbed overhead, and other costs attributable to the construction's time extension. (Id. Tab 23.) Because he believed the delay was caused by the bid protest, Terence King, COE's resident engineer, denied the REA, noting that "by your voluntary extension of your own bid during the protest period, you agreed to perform the work contained in the Contract Documents and in the time period contained therein . . . for the amount of your original bid price." (Id. Tab 9, Ex. 6.) COE agreed to add 158 additional calendar days to the

---

**24.** On June 18, 1993, the solicitation was amended to provide that the diversion tunnel

"may not be completed until April 1, 1994." (Id. Tab 26.)

schedule, but did not change the contract price. (*Id.* Tab 9, Ex. 5.)

In the fall of 1994, pursuant to the dispute resolution provisions provided for in their contract, defendant and COE submitted the dispute regarding the REA to mediation before retired Judge Robert J. Gomez, formerly of the Armed Services Board of Contract Appeals. (*Id.* Tab 24.) Judge Gomez's non-binding opinion facilitated a settlement between the parties and is informative as to the specific issues surrounding the delay in construction. Ultimately, Judge Gomez recommended that the parties share responsibility for the impact of time extensions relating both to the bid protest and the diversion tunnel, "[b]ut that because the litigative risk tilts in favor of [OCC], I would recommend a sharing range of 50–75%." (*Id.* Tab 9, Ex. 7 [Advisory Op.] at 26–27.)

Based on this opinion, on July 13, 1995, defendant submitted to COE a revised REA for $11,979,657, and pursuant to advice of counsel, COE settled for $6,950,000. (*Id.* Tab 9, Ex. 11 at 000315 and Ex. 12; Pl.'s Mot. for Partial S.J. Ex. 10 at 000429.) On September 11, 1996, COE issued a contract modification increasing the contract price by that amount. (Def.'s S.J. Motion Tab 9, Ex. 12.)

Despite the fact that this dispute was resolved through settlement with COE after it had been thoroughly aired before a mediator and researched by COE's lawyers, relator persists in claiming that defendant's bid reaffirmation was fraudulent, and that its post-contract claim for a delay-related price adjustment constituted a false claim. First, relator argues that defendant reaffirmed its bid price knowing that it could not complete the contract at that price, and that this amounted to a false bid. Relator, however, fails to cite any authority for the proposition that a contractor may not reaffirm its bid despite

rising costs or that a contractor is required to recalculate its bid when it knows that its costs have escalated. Nor can relator demonstrate that defendant made a false representation when it agreed to reaffirm its bid. By reaffirming its bid, defendant agreed to continue to be bound by its bid and the contract; it did not represent that its costs had not increased, and it did not promise that it would not seek equitable adjustments for increased costs irrespective of the justification for the increases. Finally, by reaffirming its bid, OCC put itself in the position of jeopardizing its profits by committing itself to a bid that was too low with little real prospect for recouping its losses. So one must again question relator's strained logic, for why would a contractor choose to fraudulently reaffirm its bid if the result would be to reduce its profit margin, or, as happened here, to incur a loss of over $30 million on the contract?

This conclusion is unaffected by relator's reference to the testimony of Dan Spencer, OCC's chief estimator. (Pl.'s Opp. to Def.'s S.J. Mot. at 4–6.) Mr. Spencer testified that "[i]f the contract is awarded and there are elements that affect the cost of the estimate that have happened because there was an unusual delay, then those can be identified and there can be a change to the contract." (*Id.* Ex. 1 [Spencer Dep.] at 157.) Even if Mr. Spencer intended to obtain contract modifications at some later date, it is inexplicable how this is "tantamount to an admission of a violation of the False Claims Act." (Pl.'s Opp. to Def.'s S.J. Mot. at 6.) Whether defendant was justified in expecting OCC to adjust the contract price because of the pre-award delays due to the bid protest is irrelevant. If anything, such an expression of intent is more consistent with a good faith (but perhaps erroneous) belief that there would

be a chance to recoup the losses later, and not an admission of fraud.[25]

But more importantly, such a hope, in the circumstances of this case, was not without legal justification.[26] For, as acknowledged by COE's district counsel:

> [T]he 207–day delay from the anticipated NTP date of 1 Oct. 93 to the actual issuance and receipt of the NTP on 25 Apr. 94 presents a *gray area* as to whether the Government is responsible for escalation of costs resulting therefrom.

(Def. S.J. Mot. Tab 9, Ex. 11 at 000311 (emphasis added).)[27]

Nor can relator rely on the REA submitted by OCC to argue for FCA liability.[28] First, although it is undisputed that OCC sought additional monies to cover increased costs attributable to the construction's time extension, there is no claim that the REA contained any false or fraudulent statement. On the contrary, defendant fully disclosed its position to the COE in its lengthy REA, thereby further undercutting any argument that defendant acted with the requisite intent. *See supra* note 22. Second, as previously shown, even if OCC did seek a cost adjustment based on delays attributable only to the bid protest, there is no legal or factual basis for arguing that such a position is

**25.** As observed by Judge Lopez, "putting the best possible light on the pre-award state of mind of the parties, it is difficult to imagine [OCC] willingly taking on a $7.9 million deficit at the outset. [OCC] should not be viewed as signing up to an improvident contract which it had priced anticipating working during the April–October 1994 time period. It states that it knew there would be a day-for-day delay resulting from the later NTP but that it believed that the Corps would '*do right*' by it." (Def. S.J. Mot. Tab 9, Ex. 7 [Advisory Op.] at 20 (emphasis added).)

**26.** And even if it were, as discussed *infra* at 291–92, the law makes clear that a contractor's adoption of a legally unsuccessful position does not result in FCA liability.

**27.** As recognized by COE's district counsel, the parties' contract failed to address who would be responsible for delay costs, and this absence could arguably support OCC's position that it should not be bound by the general rule that bidders assume the risk of pre-award protest delay where the government has acted reasonably. (*Id.* at 000312–15 ("The absence of [this] provision here may prove fatal if this case went to the Engineer Board of Contract Appeals or the Court of Federal Claims").) And, of course, as is apparent from Judge Gomez's Advisory Opinion, there were factual arguments available to OCC regarding the reasonableness of COE's conduct during the bid protest. (*Id.* Tab 9, Ex. 7 [Advisory Op.] at 22–25 (recognizing the possibility that it was unfair for COE to ac-

cept OCC's bid if it knew (and OCC did not) that it was inadequate as a result of the diversion tunnel delays or that the government could be at fault for failing to mitigate the delay caused by the diversion tunnel).)

**28.** An REA is a mechanism through which a contractor can request additional compensation when conditions change or the government modifies a contract. The Seven Oaks Dam contract provided for the possibility of equitable adjustments. Specifically, it stated that "[i]f any change under [the contract] causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment ...." (Def.'s S.J. Mot. Tab 20 at 4A 000677.) However, an equitable adjustment may not be used to recover losses resulting from a low bid.

> It is well established that the equitable adjustment may not properly be used as an occasion for reducing or increasing the contractor's profit or loss, or for converting a loss to a profit or vice versa, for reasons unrelated to a change. A contractor who has underestimated his bid or encountered unanticipated expense or inefficiencies may not properly use a change order as an excuse to reform the contract or to shift his own risks or losses to the Government.

> *Pac. Architects & Eng'rs Inc. v. United States,* 203 Ct.Cl. 499, 491 F.2d 734, 739 (1974).

fraudulent. But the Court need not rest on that conclusion alone, since it is clear from the Advisory Opinion that the costs associated with delays attributable to the diversion tunnel were properly recoverable, and contrary to plaintiff's simplistic argument (*see* Pl.'s Reply at 17–21), these delay costs could not artificially be limited only to the period of time after the bid protest had been resolved. (*See, e.g.,* Def. S.J. Mot. Tab 9, Ex. 7 [Advisory Op.] at 15–16.)[29] It is therefore clear that OCC had a basis, both in law and fact, to recover cost increases whether they were incurred before or after the contract award.

In effect, relator's position amounts to nothing more than a complaint that OCC proposed "unreasonable contract interpretations and twisted factual presumptions," and that this, according to plaintiff, is legally sufficient for purposes of the FCA. (Pl.'s Opp. to Def. S.J. Mot. at 2, 31–33.) Simply put, that is *not* the law. Disputed legal issues do not constitute fraud. *UMC Elec. Co. v. United States,* 43 Fed. Cl. 776, 794 (Fed.Cl.1999) (a contractor who "takes advantage of a disputed legal issue does not knowingly commit fraud"), *aff'd* 249 F.3d 1337 (Fed.Cir.2001). This principle

has been echoed by this Circuit in no uncertain terms:

> [D]isputes arise between the government and its contractors every day. Contractors do not win every penny they claim. On [the relator's] theory, any contracting party that misunderstands its legal entitlements and therefore fails to recover on an invoice in full would be liable under the [FCA]—except in instances where it was unaware of the facts that led to its failure to recover in full. This is not a prescription for fair or efficient contracting.

*Siewick,* 214 F.3d at 1378.[30] *See also United States v. Basin Elec. Power Co-op.,* 248 F.3d 781, 794 (8th Cir.2001) (noting that " 'simple contract breaches'... cannot provide evidence of a knowing violation of the Act").

Here, defendant made a claim for a contract adjustment, and there was a dispute over its entitlement to recover. Even though COE vigorously disputed defendant's claim, the matter was ultimately settled by the government when it agreed to pay an additional $6.9 million. While relator may be correct that "[t]he fact of settlement does not insulate a defendant from liability for knowingly advancing

**29.** In fact, the diversion tunnel delay became apparent when Tutor–Saliba failed to complete the tunnel by June 1, 1993—a month before the bids were opened and at least eight months before the contract award. (*Id.* at 10.) And "it was the delay in the diversion tunnel and not the bid protest which was the proximate cause of the additional costs ... the bid protest only had an incidental impact." (*Id.* at 15.) With this in mind, the Advisory Opinion concluded that costs for the entire one-year delay could well be recoverable. (*Id.* at 16, 26–27.)

**30.** In making his argument, plaintiff fails to even mention, no less address, *Siewick.* Instead he cites only *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357 (Fed.Cir. 1998). (*See* Pl.'s Opp. to Def.'s S.J. Mot. at 31–33, 37–38.) That case, unlike *Siewick,* is not

binding on this Court, but more importantly, it is factually very different from this case. The contractor in *Commercial Contractors* submitted invoices for services that were in direct contravention to clear and unambiguous contract terms. 154 F.3d at 1364. In rejecting the contractor's contract interpretation, which was raised for the first time in defense to the FCA claim, the court found the contractor's position "so unreasonable as to defeat [its] assertion that it pressed its claims based on a good faith belief of entitlement." *Id.* But nonetheless, the Federal Circuit recognized that a contractor who presses a claim based on a "plausible but erroneous contract interpretation" will not be liable "absent some specific evidence of knowledge that the claim is false or of intent to deceive." *Id.* at 1366.

false claims" (Pl.'s Opp. to Def.'s S.J. Mot. at 2), the fact that plaintiff believes that the COE's settlement was improvident is absolutely irrelevant to the issue of whether defendant violated the FCA. The question is not whether OCC's litigation posture was a winner, but whether defendant submitted a false or fraudulent claim.

In sum, based on the undisputed facts, plaintiff cannot, as a matter of law or fact, show that OCC fraudulently induced COE to enter into the contract by reaffirming its bid during the period of the bid protest or that OCC submitted a false REA after the contract was awarded. OCC's REA, which ultimately resulted in a $6.9 million contract adjustment, reflected a contract dispute, not a false claim within the meaning of the FCA, and as recognized in *Siewick*, to hold otherwise would frustrate an important societal interest in "fair or efficient contracting." 214 F.3d at 1378.

## C. Relator's Factual Claims Regarding Post–Contract Conduct

■ In addition to the delay-related equitable adjustment, relator also argues that two additional REAs constituted false claims—(1) the REA for fill material for Zones 3 and 5, as well as for Zones 4A and 4B (Pl.'s Opp. to Def.'s S.J. Mot. at 8–15, 37–39); and (2) the REA for unsuitable alluvial materials. (*Id.* at 16–18, 39.) [31] As to both of these REAs, plaintiff's position is without factual or legal support.

### (1) Zones 3, 5, 4A and 4B

In October 1999 defendant submitted a REA in the amount of $48,056,013 related to Zones 3 and 5 of the embankment, which are the primary zones on the upstream portion of the dam. (Pl.'s Opp. to Def.'s S.J. Mot. Ex. 7 at 3–5 08010.) In its claim, defendant contended that the contract's design specifications allowed for production of Zones 3 and 5 from a combined material. (Def.'s Reply Tab 2 at 8–10.) Specifically, defendant argued that the contract specifications permitted it to crush all of the rock excavated from the borrow sources and create a combined material that would satisfy specifications for both Zones 3 and 5.[32] In October 1994

---

**31.** Relator's Fourth Amended Complaint lists several additional requests for payment above the contract price. Specifically, relator cites adjustments related to unexpected conditions: (1) at the Finger Waste area (Compl.¶ 31); (2) at the outlet works (Compl.¶ 32); (3) at Government Canyon Ridge (Compl.¶ 34); and (4) for the need of an abutment drain (Compl.¶ 35). Relator offers no evidence or argument regarding these requests for adjustments. Relator also cites excess payments related to the one-year delay in cofferdam construction. (Compl.¶ 28.) This claim was discussed *supra* at Section III(B)(3). Finally, relator cites claims related to: (1) false progress reports, (Compl.¶ 37); (2) the right abutment (Compl.¶ 29); and (3) the Intake Structure Access Road (Compl.¶ 30). These are the subject of Counts III, IV, V, and VI, and will be considered *infra*.

**32.** The contract provided that Zone 3 shall be processed to remove stones larger than 12 inches, and not more than 5 per-

cent, by weight, shall pass a No. 200 sieve, and shall be well graded between 12 inches and a No. 200 sieve. Materials from these sources that are smaller than 12 inches shall be used in Zone 3 and materials larger than 12 inches shall be used in Zones 5 and 6.

(Pl.'s Opp. to Def.'s S.J. Mot. Ex. 3.)
Additionally, Zone 5 materials
shall consist of 12 inch to 30 inch stones obtained as a by–product from the production of Zone 3 material .... These materials may be crushed to facilitate transportation and placement. If crushed, the material shall contain no particle larger than 18 inches, and not more than 35 percent, by weight, shall pass a one inch screen.
(*Id.*)
Defendant's original plan was to crush all of the rock excavated from the borrow sources and create a combined material less than 12 inches in size. It believed that this

COE learned of this plan. (*Id.* Tab 3 ["King Dep."] at 59.) COE considered defendant's plan to be inconsistent with contract specifications.[33] After initial discussions about a compromise that would have allowed a combined material, COE notified defendant that separate materials for Zones 3 and 5 would be required. (*Id.* Tab 2 at 28–30.) Defendant considered this to be a change in the specifications and filed a post-contract REA in October 1999. (Pl.'s Opp. to Def.'s S.J. Mot. Ex. 7 at 3–5 08010.) COE initially denied defendant's REA, finding that its own interpretation is the only one that "does not render meaningless" certain contract drawings. (*Id.* at 3–5 08039.)

In addition, defendant also submitted a separate REA on June 7, 1999, for $8,921,920 plus costs relating to Zones 4A and 4B, the two primary zones on the downstream portion of the dam. (Pl.'s Opp. to Def.'s S.J. Mot. Ex. 11 at 4A 006288.) Defendant believed that materials provided to prospective bidders indicated that mass excavation of the borrow areas for these zones would be appropriate.[34] (Def.'s Opp. to Def.'s S.J. Mot. Tab 6 at 6–14.) However, during excavation, defendant discovered that materials in the borrow areas were not of the same consistent quality as allegedly represented in COE's pre-bid documents, and it was required to excavate selectively and perform selective placement of the materials.[35] (Pl.'s Opp. to Def.'s S.J. Mot. Ex. 11 at 4A 006288–89; Def.'s Reply Tab 6 at 2.) Defendant claimed these results constituted a differing site condition for which it was entitled to an REA. (Pl.'s Opp. to Def.'s

would satisfy the specifications for both Zones 3 and 5 as follows: (a) not more than 35% of the material would pass a one-inch screen when placed in Zone 5, (b) not more than 5% of the material would pass a No. 200 sieve for both Zones 3 and 5, and (c) 100% of the material would pass a twelve-inch screen for both Zones 3 and 5. (Def.'s Reply Tab 2 at 8–10.) COE refused to allow defendant to use this plan. (*Id.* at 28–30.)

33. In addition to COE, plaintiff cites to the testimony of Fritz Huber, defendant's chief engineer, who also believed that the specifications called for distinct materials in each zone. (Pl.'s Opp. to Def.'s S.J. Mot. at 10; Ex. 6 [Huber Dep.] at 36–37, 41.)

34. Here, selective excavation would mean excavating Zone 4A material from one area, and Zone 4B material from another area. (Def.'s S.J. Mot. Tab 3 [Spencer Dep.] at 65–66; Def.'s Reply Tab 9 [Huber Dep.] at 59–61.) In contrast, mass excavation would allow both to be excavated from the same area collectively.

35. Relator unsuccessfully attempts to cast doubt on defendant's claim that differing site conditions found during excavation justified an REA. He argues that when OCC submitted its REA, it justified its position by explaining that at the pre-bid stage, it expected to do only mass excavation with no further processing, and according to plaintiff, this was a false statement, since OCC knew when it submitted its bid that the intermediate step of processing would be necessary. (Pl.'s Opp. to Def.'s S.J. Mot. at 11–15.) This argument is both factually inaccurate and irrelevant, since the REA was unrelated to the need for processing (Def.'s Reply Tab 6 at 36–37, 38–39), and processing and selective excavation are distinct concepts. Selective excavation involves obtaining materials with differing specifications from separate sites (i.e., Zone 4A material from one site and Zone 4B material from another) (Def.'s Reply Tab 9 [Huber Dep.] at 59–61), whereas processing mass-excavated materials involves breaking down materials obtained from a single site to smaller sizes in order to meet specifications. (*Id.* Tab 3 [King Dep.] at 59–60). Given these differences, it does not matter if OCC was aware at the bid stage that processing would be necessary, since the unanticipated site condition was caused by the fact that materials in the spillway and Government Canyon were not the same consistent quality as represented by COE. Thus, selective excavation, not mass excavation and processing, was required, and it was the need for selective excavation, not processing, that motivated the filing of an REA.

S.J. Mot. Ex. 11 at 4A 006288.) Initially, COE denied the REA, finding "[n]o reasonable basis for [an equitable adjustment based on a] differing site condition or compensable [contract] change." (*Id.* at 4A 006313.) However, in May 2002, after arbitration, COE settled a host of claims, including those related to Zones 3, 5, 4A and 4B, for $38.5 million. (Def.'s Stmt. ¶ 92.)

Similar to the delay-related REA, the REAs for Zones 3 and 5 and Zones 4A and 4B cannot be characterized as false claims within the meaning of the FCA. Neither REA contained any misrepresentations, nor did OCC try to mislead the COE. Plaintiff nevertheless argues, without legal citation, that "[t]he government's knowledge defense does not avail [OCC] in this context because [of] the unreasonable nature of its contract interpretation. What the government knew is irrelevant ... whenever a contractor attempts to deceive the government .... Finally, the parties' settlement of this particular dispute is likewise irrelevant because any Corps of Engineers official who sought to waive the government's rights under the FCA would be acting *ultra vires.*" (Pl.'s Opp. to Def.'s S.J. Mot. at 38.) But, plaintiff's reading of the law is incorrect. The unreasonableness of defendant's contract interpretation is not, as a matter of law, sufficient under the FCA. *Siewick*, 214 F.3d at 1378. Moreover, even COE's own counsel recognized that defendant's claim for Zones 3 and 5 had merit. (Def.'s S.J. Mot. Tab 67.)[36] Second, the government's knowledge, while perhaps not a complete defense, is not "irrelevant," since it serves to negate a finding of scienter. *See supra* note 22. And finally, there can be no factual or legal basis for ignoring the settlement on the basis that a COE official was acting *ultra vires.* On the contrary, the fact of a settlement, while not dispositive, is relevant insofar as it supports an inference that the defendant was involved in a contract dispute with the government, not that a government officer knew of a fraud and nonetheless decided to settle.

### (2) Alluvial Materials

For similar reasons, plaintiff fares no better with respect to the REA relating to alluvial materials. This REA, submitted by OCC on December 1, 1997, sought an additional $416,618 because of a claim of differing site conditions during the excavation of the foundation of the dam. Relying on a series of memoranda developed by COE employee Mark Guevara in opposition to OCC's request for additional funds (*see* Pl.'s Opp. to Def.'s S.J. Mot. Exs. 12, 19, and 20), relator faults defendant both for underestimating the amount of unsuitable material that it expected to encounter and for overestimating the amount of unsuitable material actually encountered, and based on this, plaintiff claims that OCC should not have been able to argue for an adjustment based on differing site conditions. (Pl.'s Opp. to Def.'s S.J. Mot. at 16.) However, determining amounts of unsuitable material at the bid stage, as well as figuring out amounts actually encountered, involves estimates, not precise measurements (*see* Def.'s Reply Tab 8 [Guevara Dep.] at 54–55, 58; Tab 1 [Relator Dep.] at 203–204), and even if plaintiff could suggest a better methodology than was used by defendant, there is no basis for imposing FCA liability based on faulty or mis-

**36.** As stated by COE's counsel, *"I am practically convinced that a judge will find that the specs do not exclude/prohibit crushing all materials to –12 in. The Board will find reasonable any interpretation which is* rational. If we wanted material greater than 12 in., we could have written the specs to [say] what we wanted." (*Id.* (emphasis in original).) (*See also* Def.'s S.J. Mot. Tab 68; Def.'s Reply Tab 2 at 12–15; Tab 4 at 4; Tab 5.)

taken engineering judgments. *Luckey*, 2 F.Supp.2d at 1047 ("[T]he common failing of engineers ... are not culpable under the [FCA]" (internal quotation marks and citation omitted).)

But more importantly, even if Mr. Guevara's arguments are persuasive, this does not resolve the issue. Rather, a debate over OCC's entitlement to additional money for differing site conditions is nothing more than a contract dispute between the parties: initially COE denied OCC's REA, but thereafter, several of Guevara's superiors at COE, including John Long, Terence King, and division counsel Stephen Temmel, concluded that OCC had made a sufficient showing to justify an adjustment, and as a result, a settlement of approximately $380,000 was negotiated. (Def.'s S.J. Mot. Tab 9 [King Decl.] ¶ 32; Tab 18 [Long Decl.] ¶ 17 and Exs. 17, 18.) The REA was not, however, a false claim within the meaning of the FCA.

While plaintiff may well have reason to quibble with COE's decision to settle, there is no evidence upon which to infer that OCC fraudulently understated its bid or that it obtained an increase in the contract price that was based on a false claim with respect to the excavation of unsuitable alluvial materials.

## IV. Count III

■ Defendant also seeks summary judgment as to Count III, which alleges that defendant's claims for progress payments violated the FCA because they contained false statements. The contract provided that the government "shall make progress payments monthly as the work proceeds ... on estimates of work accomplished ...." (Def.'s S.J. Mot. Tab 17 [Contract Clause 1.65(b) ].) Because much of the work involved placing fill material into the dam's embankment, progress was estimated in part by using regular surveys of the height of the dam. (Def.'s Stmt. ¶ 13.) The contract required that "[q]uantity surveys shall be conducted, and the data derived from these surveys shall be used in computing the quantities of work performed and the actual construction completed and in-place .... The Contractor shall make the computations based on the surveys for any periods for which progress payments are requested." (Pl.'s Opp. to Def.'s S.J. Mot. Ex. 14 [Contract Clause 6.1–6.2].)

Because work on the dam continually progressed, "[b]y the time [defendant] had submitted its pay application, the application would understate the work that [defendant] had actually completed." (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 9.) To account for this lag time, defendant, using a method developed in conjunction with COE, supplemented the survey data with an estimate calculated by multiplying a daily average increase in the height of each zone by the number of days between the survey and submission of the request for payment. (*Id.*) John Long, the COE engineer responsible for approving progress payments, believed the adjustments "were necessary to ensure that the partial payment invoice accurately estimated the amount of material placed in the Dam during the pay period." (*Id.*) He noted that survey data was used "to provide meaningful estimates of progress at the Dam site, not precise measurements of the exact quantity of material placed." (*Id.* ¶ 11.) Further, OCC and COE met monthly to discuss defendant's progress estimates, and they agreed on the amount of partial payments to be made. (Def.'s Stmt. ¶ 14.)

Relator alleges that this process resulted in defendant's submission of false and misleading survey data to obtain payment from COE.. To this end, relator makes much of the fact that defendant apparently

used non-survey data in calculating its progress payments. (Pl.'s Opp. to Def.'s S.J. Mot. at 29–30, 39–40.) He alleges that by using truck load counts and possibly belt scales to estimate progress from the time of the survey until the claim for progress payment, defendant "knowingly presented figures to COE that were dishonestly inflated or which manifest a reckless disregard for the truth." (*Id.* at 30.) However, there is simply no evidence that the survey results or corresponding estimates contained data that defendant knew to be false or dishonestly inflated.

Rather, what the evidence shows is that defendant cooperated with COE to come up with an approach to ensure that progress payment requests were fair and reasonable estimates of the work performed. Even though defendant's methodology for supplementing its survey results was not an "exacting science" (*id.* at 30), defendant made these adjustments with Mr. Long's full knowledge and consent, and in accordance with the methodology developed jointly by the parties. So, even if it were true that defendant's estimates did not strictly comply with the contract specifications, the parties agreed to a strategy in an attempt to ensure that claims for progress payments "fairly and reasonably estimated the amount of material placed in the embankment during the pay period." (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 12.) As a matter of law, this cannot constitute fraud. *Windsor* 895 F.Supp. at 853–54 (finding no FCA violation where the government and its contractor worked together to solve a problem created when the

contract's rigid billing provisions did not accommodate changed circumstances). *See also United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 328 (9th Cir.1995) ("Even if the discrepancy constituted a false statement, the [government] knew of the discrepancy, and so [defendant] did not 'knowingly' submit a false claim.").[37]

Also irrelevant is relator's argument that because defendant's surveys and estimates differed from COE's, these estimates were necessarily false. (Pl.'s Opp. to Def.'s S.J. Mot. at 28.) On some occasions, COE conducted its own surveys for comparison with defendant's. (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 7.) However, it is undisputed that COE's surveys were conducted at different times, using different equipment, and relying on different survey points than defendant's. (Def.'s Stmt. ¶ 15.) This was significant because the height was not uniform across the width or depth of the dam. (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 8.) And, as even relator's expert acknowledged, surveys conducted at different times would be expected to differ if work had progressed in the interim. (Def.'s S.J. Mot. Tab 4 [McKittrick Dep.] at 105–08.) "The comparison surveys conducted by [COE] were not intended to be the basis for an exact comparison with [defendant's] measurements of the height of each zone of the Dam," and accordingly, Mr. Long was "not troubled by the differences in the survey data." (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 8.) As a result, the discrepancies between defendant's surveys and COE's are hardly evidence of fraud.

**37.** This conclusion is bolstered by the fact that the contract gives discretion to the contracting officer. According to Section 1.65(e), "[i]f the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full." (Def.'s S.J. Mot. Tab 17.) Mr. Long's testimony demonstrates that he regularly met with defendant to discuss progress payments, they worked together to resolve any disagreements, and he properly exercised his discretion to authorize payments. (Def.'s S.J. Mot. Tab 18 [Long Decl.] ¶ 10.)

In short, there is no evidence to support a finding that defendant's requests for progress payments constituted false claims. Defendant's requests were based upon a mutually agreed-upon methodology. Further, there is no basis to infer fraud based on any differences between defendant's survey data and COE's data. There was thus no "stealthy endeavor designed to deceive" COE (Pl.'s Opp. to Def.'s S.J. Mot. at 40), but rather, COE was fully aware of and approved of the way that defendant calculated its claims for progress payments. Accordingly, Count III must be dismissed.[38]

## CONCLUSION

For the reasons given above, defendant's motion for summary judgment as to all counts is granted, and relator's motion for partial summary judgment is denied. The above-captioned case is therefore dismissed with prejudice. A separate Order accompanies this Memorandum Opinion.

## *JUDGMENT*

For the reasons given in the attached Memorandum Opinion, it is hereby

**38.** Defendant also moves for summary judgment as to Counts IV, V, and VI. As noted (*see supra* note 5), relator has provided *no* argument in his Opposition to Defendant's Motion for Summary Judgment as to these counts, and thus, they can be treated as conceded.

However, relator does, in paragraph 33 of his Response to Defendant's Statement of Material Facts on Which there Is No Dispute, appear to take issue with one of defendant's factual assertions relating to Counts IV and VI. Since he fails to mention these counts in his pleadings, it is difficult to discern what arguments, if any, he is making. Moreover, even if, as plaintiff asserts in his Response, OCC agreed that only a limited amount of blasting and pre-splitting actually occurred at the dam's right abutment, that does not mean that OCC committed fraud years earlier when it submitted a proposal in April 1995 for excavating the right abutment after a massive rock slide, stating that "[b]ecause it is very

**ORDERED** that defendant's Motion for Summary Judgment [82] is **GRANTED**; it is

**FURTHER ORDERED** that relator's Motion for Partial Summary Judgment [83] is **DENIED** and plaintiff's complaint is dismissed with prejudice.

**SO ORDERED.**

difficult to accurately determine how much of the slope material can be mechanically removed, and how much will have to be drilled and shot, this proposal incorporates the probability and risk of a 70% blasting requirement." (Def.'s Stmt. ¶ 33.) Whether OCC landed up overestimating the extent of pre-splitting and blasting that in fact was required cannot, as a matter of law, be equated with a false claim. *See, e.g.,* Bennett v. Coors Brewing Co., 189 F.3d 1221, 1230 (10th Cir.1999) ("fraud cannot consist of unfulfilled predictions ... as to future events"); *Harrison I,* 176 F.3d at 792 ("[e]xpressions of opinion are not actionable as fraud"). In addition, there is no claim that OCC submitted any claim for work it did not do or that it misled COE with respect to the amount of pre-splitting or blasting that it actually performed. Thus, any possible argument relating to Counts IV and VI must be rejected.