**RILEY CONSTRUCTION COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 02–953 C.

United States Court of Federal Claims.

April 28, 2005.

Douglas C. Proxmire, Patton Boggs, L.L.P., Washington, D.C., for plaintiff.

Andrew P. Averbach, United States Department of Justice, Washington, D.C., for defendant.

### ORDER AND OPINION

HODGES, Judge.

Riley Construction Company filed this suit after completing a construction contract with the Navy. Plaintiff alleged in the Complaint that the Navy required a larger building than disclosed in the Request for Proposal. The claim for added costs of constructing the larger building included additional fees for the architecture firm that Riley employed, Knight Architects/Engineers. The parties filed cross-motions for summary judgment on Riley's claim, and we scheduled an evidentiary hearing because of confusion over certain terms used in the construction contract.

Mr. Riley is president of Riley Construction. The Government deposed Mr. Riley for the first time less than a month before the hearing. He testified during his deposition that Knight, the A/E company, had not billed Riley Construction for the additional fees that plaintiff seeks in its claim. The Government then filed a motion for leave to amend its Answer to add an affirmative defense and counterclaims for fraud and false claims. We granted defendant's motion and canceled the evidentiary hearing because of the potentially dispositive nature of defendant's supplemental Answer.

We conducted a two-day hearing on the Government's counterclaims and affirmative defense. Mr. Riley and employees of the Knight A/E firm testified at the hearing. We did not find that plaintiff acted with the intent that is a necessary element of the fraud and the forfeiture statutes. We cannot rule now on Riley's alleged deliberate ignorance or reckless disregard in claiming architecture and engineering fees on Knight's behalf. Such findings depend on factual and legal issues related to the Navy's contract with Riley and Riley's contract with Knight.

## BACKGROUND

Riley Construction Company contracted with the Navy to design and construct a Navy Exchange Fleet Store at the Great Lakes Naval Training Center in Illinois. Soon after contract award, confusion arose over the size of the building. The Request for Proposal called for a building of approximately 56,000 square feet. Riley's interpretation of the specifications and definitions in the RFP created issues regarding two disputed areas of the building. These were a "mezzanine and storage system," and part of an area outside the building that was covered by a canopy. The result was that Riley thought the building's footprint could be no larger than 49,000 square feet. Riley claims that it prepared and priced its bid accordingly.

The difference between the Navy's interpretation of the contract and Riley's is the size of the "mezzanine and storage system" and the disputed canopy area, approximately 7,000 square feet. Defendant discounted Riley's interpretation. It directed plaintiff to build a Fleet Store with approximately 56,000 square feet on the ground floor, and to also to build the mezzanine and the area under the canopy.

Riley proceeded as directed and completed the Fleet Store in September 2000, then filed a $948,963 claim for additional costs in April 2001. Plaintiff attributed the additional costs to the larger building required by the Navy. The claim included $73,176 for additional architecture and engineering fees for Knight to design the larger building. The contracting officer asserted that the Request for Proposal called for a building of 56,000 square feet, and denied the claim.

## DISCUSSION

Riley Construction first learned of the Fleet Store project from Knight Architects/Engineers. The Request for Proposals called for a building of approximately 56,000 square feet. Confusion arose from the Navy's having included a "mezzanine and storage system" in the RFP, along with an unenclosed area under a canopy. The parties disagree on how to account for the disputed areas. The additional design fees in Riley's claim are the focus of this Opinion. This is so because Knight had not billed the additional design fees that Riley claimed. Mr. Riley explained that Riley and Knight had a relationship that permitted such a result.

Plaintiff attempted to distinguish its relationship with Knight from that typical of a prime contractor and its subcontractor. Riley and Knight were a "design-build team" that should be treated as a single entity, according to plaintiff. Mr. Riley did not include Knight among its subcontractors in the bid proposal "[b]ecause they're not a subcontractor .... They are our partner." Riley and Knight had worked together on another Navy construction project, but they had no legal or ongoing business relationship. Mr. Riley points to provisions of its design contract that place the responsibility for all

legal services and cost estimation on Riley.[1] Mr. Riley testified that he thought such services included assembling and submitting claims for Knight. He also highlighted the unusual nature of the Fleet Store project.

Mr. Riley described the Fleet Store project as a "bid-design-build" contract. This requires contractors to submit bids without the benefit of an existing design, but only descriptive specifications such as square footage, types of facilities, capacities, and fixtures. The Fleet Store was the first bid-design-build project that Riley Construction had undertaken. Mr. Riley testified that this type of contract entails greater risk than the more common design-bid-build sequence in which the Government provides a design upon which contractors base their bids. In the latter situation, "a contractor can take the drawings and take the information ... [and] collect pricing, analyze it, and basically know this is the amount of work we're going to provide, and this is the amount of money it's going to cost."

The Fleet Store contract required contractors to submit bids with only part of the information needed to price construction of the building, Mr. Riley explained. He testified that one consequence of the Fleet Store project's bid-design-build contract was the lack of baselines against which to assess additional costs of the larger building. For example, Riley did not know precisely how much concrete the Fleet Store would require before submitting its bid because the building had not yet been designed. Riley suggested that similar problems applied with regard to the design fee.

The contract between Riley and Knight called for a design fee of $353,939. Mr. Riley testified that he understood the architecture and engineering fee to be a percentage of total construction costs—approximately six percent. Mr. Jorge Sirgo, who was Knight's project manager for the Fleet Store, corrobo-

rated Mr. Riley's understanding in a limited sense. He stated that Knight proposed its design fee *based on* the original construction cost of $5,997,000. He did not testify that the fee *was* a percentage of the total, however. Knight's fee in fact was slightly less than six percent of the total.

Mr. Riley testified that such percentage fee arrangements are standard in the industry. Mr. Sirgo concurred, stating that architecture and engineering fees are "usually [calculated as] a percentage of the overall construction cost." Mr. Riley testified repeatedly that Knight's fee was six percent of Riley's construction cost, but he also acknowledged that the design contract compensated Knight with a fixed fee of $353,939.

Mr. Sirgo commented, "[w]e were competing against other firms. So sometimes in the field we call it sharpening the pencil to have a fee that is very tight, trying to present a very attractive offer to the Government." Mr. Riley agreed, testifying that the design fee was determined through "a cumulative effort between Knight and Riley.... We talked about what it should be[.] *[W]e talked in terms of percentages of the cost of construction.* Ultimately Knight determined that it would be this amount *based on six percent* [of construction costs], and they plugged that number in." [2] (Emphasis added.) Thus, the parties arrived at a fixed fee derived from a percentage that was standard in the industry.

Knight worked on both the design phase and the construction phase of the Fleet Store project. It designed and engineered the building during the design phase and reviewed shop drawings and responded to Requests for Information throughout the construction phase. Knight budgeted 2,840 hours for its work on the design phase. By the end of the design phase, however, Knight had spent 3,277 hours on the Fleet Store. Testimony regarding Riley's knowledge of

---

1. Section 2.6 of the subcontract states, "[t]he Design/Builder shall furnish all legal, accounting and insurance counseling services as may be necessary at any time for the Project." Section 2.7 adds, "[t]he Design/Builder shall furnish all cost estimating services required for the Project."

2. Mr. Sirgo explained that architecture and engineering fees are calculated in a number of ways. "We have two ways to look at fees and sometimes three or four. One is an overall percent of construction, but we elect to test that against—by discipline."

Knight's excessive hours during the design phase was conflicting, but Knight did not charge Riley additional fees because of a larger building. Mr. Sirgo testified in his deposition that a large part of the overrun was attributable to the footprint issue, but at the hearing he was unsure about the amount. "Sometimes we begin to see that there is a loss of hours," Mr. Sirgo commented, "but at the end, if we are lucky[,] ... we can get back to the original forecast." Indeed, that is what happened here—Knight came in 411 hours *under* budget during the construction phase, and overall spent only 26.75 hours more than it had budgeted for the job.

## LEGAL ISSUES

■ Riley claims that the RFP and the Contract contain defective specifications. Federal Acquisition Regulations provide that in such cases, "the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications." 48 C.F.R. § 52.243–4(d) (Aug.1987). A contractor must show that its costs increased because of the changed requirements, that the increased costs arose from conditions materially different from those stated in the contract documents, and that such conditions were reasonably unforeseeable to the contractor. *See SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed.Cl. 196, 224 (1998) (citing *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 33 (1987)).

■ Contractors seeking an equitable adjustment of more than $100,000 must certify (1) that the claim is made in good faith, (2) that any supporting data are accurate and complete to the best of the contractor's knowledge and belief, and that (3) the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable. 48 C.F.R. § 52.233–1(d)(2)(iii) (July 2002). Filing a request for equitable adjustment implies that the contractor has incurred all costs submitted unless the claim clearly states otherwise. *See UMC Elecs. Co. v. United States*, 43 Fed.Cl. 776 (1999) (finding a false claim where the contractor did not distinguish between costs for which the contractor had

received invoices and costs that were merely estimates).

The Government asserted an affirmative defense under the Forfeiture of Fraudulent Claims Statute, 28 U.S.C. § 2514, and counterclaims under the fraud provision of the Contract Disputes Act, 41 U.S.C. § 604, and the False Claims Act, 31 U.S.C. §§ 3729—3731. We have not found so far that Riley had the intent to deceive or to defraud the Government that is necessary to rule under the Forfeiture of Fraudulent Claims Statute or the fraud provision of the Contract Disputes Act. We focus here on the possible application of the False Claims Act.

■ The False Claims Act does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b). A contractor can be held liable for civil penalties under the False Claims Act if the contractor "acted with the requisite knowledge and the corresponding claim was false." *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1371 (Fed.Cir.1998) (citing *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir.1972)). "Requisite knowledge" may include deliberate ignorance or reckless disregard of the truth or falsity of the information at issue. 31 U.S.C. § 3729(b). "Reckless disregard" has been defined as an " 'aggravated form of gross negligence.' " *UMC*, 43 Fed.Cl. at 792 n. 15 (quoting *United States ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 682 (10th Cir.1998)).

■ To prove that plaintiff filed a false claim under this statute, the Government must show (1) that Riley presented a claim for payment; (2) that the claim was false or fraudulent; and (3) that Riley knew the claim was false or fraudulent, or acted in deliberate ignorance or reckless disregard of its truth or falsity. *See Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir. 1994). We have not found that Riley had actual knowledge that the claim was false. The issue therefore is whether Riley acted in deliberate ignorance or reckless disregard for its truth or falsity.

■ Congress amended the False Claims Act in 1986. Pub.L. No. 99–562 § 2(7). A Senate Committee Report supporting the

amendment states, "[t]he Committee is firm in its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." S.Rep. No. 99–345, at 7 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272. Plaintiff insists that it acted in good faith and that its lack of communication with Knight was mere negligence that does not rise to the level of fraud. The Report also notes, "the Committee does believe that the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure that the claims they submit are accurate." *Id.*

Riley did not make a "limited inquiry" into the accuracy of the additional architecture and engineering fees that it seeks in the claim. Knight did not provide Riley an accounting of additional hours or costs related to the footprint issue or otherwise participate in the claims process, nor could it have. Knight had no knowledge that the claim was being contemplated. Knight did not bill Riley for extra work and it did not inquire about recovering additional fees. It is apparent that Knight did not believe that Riley owed it any fees. Riley did not make an effort to find out whether Knight had or would demand additional fees. This may rise to the level of reckless disregard, depending on testimony at the merits hearing, legal arguments regarding the meaning of that term, and the nature of the design contract.

Riley Construction Company had never submitted a Request for Equitable Adjustment before the Fleet Store project, and Mr. Riley stated that he is not very familiar with the Federal Acquisition Regulations. Riley Construction Company is an experienced business, however. The company typically employs between 175 and 200 employees and its average annual revenue is $75 million. Riley's commercial construction jobs have ranged in value from $10,000 to $35 million. Riley has performed "hundreds" of municipal, state, and federal Government contracts since 1988. Mr. Riley has worked on many bid proposals, including some since he was appointed president of the company in 2001.

Riley employed Mr. Anthony Douglas, who had been a Resident Officer in Charge of construction for the Navy, to help prepare the claim. He helped Mr. Riley prepare the claim, but we do not know whether he advised Riley regarding the architect fee.

Mr. Sirgo testified that no one from Knight asked Riley to file a claim or otherwise to recoup money on Knight's behalf. Riley accepted the Navy's directions under protest in July 1999 and submitted the claim to the Government in April 2001. Riley did not inquire of Knight about the possibility of its having incurred additional fees because of the larger building. Riley did not send a copy of the claim to Knight or contact Knight to verify plaintiff's claim. Mr. Riley disclosed the claim to Knight for the first time in April 2004, after Government counsel informed Riley that it intended to pursue the counterclaims. Mr. Sirgo testified that Knight had not been aware that Riley was seeking $73,000 in additional architecture and engineering fees. When he relayed this fact to Mr. Barnes, Knight's senior vice president, Mr. Barnes seemed surprised.[3]

The Government has alleged that Riley did not consult with Knight about the claim and the additional fees because Riley intended to keep any additional fees it recovered for itself. Defendant did not present evidence to support this charge, however. Plaintiff argues that the Navy knew exactly how he compiled the claim because the request for equitable adjustment discloses it in full.

Plaintiff contends that it is not liable because the Navy has been fully aware of the facts surrounding Riley's claims. *See, e.g., United States ex rel. Bettis v. Odebrecht Contractors, Inc.,* 297 F.Supp.2d 272 (D.D.C. 2004); *United States ex rel. Lamers v. City of Green Bay,* 998 F.Supp. 971, 988 (E.D.Wis. 1998) (holding that an "open dialogue with government officials about relevant factual circumstances ... mitigate[s] a defendant's specific intent to defraud, or the degree to which false statements and claims were 'knowingly' submitted."). The defendant in *Bettis* "fully disclosed its position ... in its lengthy REA, thereby ... undercutting any

---

**3.** Although Mr. Barnes was the executive overseeing the Fleet Store project, he billed only three hours to it. Mr. Barnes made clear that he had little knowledge of the project's details.

argument that defendant acted with the requisite intent." 297 F.Supp.2d at 290.

Mr. Riley noted that he provided a Cost Analysis with his claim and explained how Riley had calculated the claim. The REA does include an explanation of Riley's claim, though it does not address whether Riley and Knight had a fixed-fee contract. Riley treated Knight's fee as though it varied with the total construction costs. The Federal Acquisition Regulations provide that equitable adjustments are for "increased cost[s] reasonably incurred." 48 C.F.R. § 52.243–4(d) (Aug.1987). Whether the Navy's direction was a contract change and whether Riley's claimed additional costs resulted from the Navy's direction are matters for consideration at trial.

We cannot rule on plaintiff's liability for civil penalties under the False Claims Act at this stage. The findings outlined in this Opinion and Order present a close question of whether Riley deliberately ignored or recklessly disregarded the truth of its claim for additional architecture and engineering fees. Riley knew that Knight had not billed additional fees based on the larger footprint, and it could easily have checked with Knight during the years that this case was pending. Instead, Riley pursued its claim upon the representation that Knight's fee varied with the total cost of construction.

The parties have not argued the effect of the design contract. While it appears to be a fixed-fee contract, other provisions of the design contract could affect that crucial issue. For example, the design contract states, "IF THE SCOPE of the Project or of the Architect's services is changed materially, the Architect's compensation shall be equitably adjusted." Standard Form of Agreement Between Design/Builder and Architect, Part I, Article 9, § 9.6. *See also, id.,* Article 9, § 9.7 ("The compensation set forth herein shall be equitably adjusted if through no fault of the Architect the services have not been completed within Twenty–Four (24) months of the date of this Part I Agree-

ment."). Various clauses address timeliness of payments and incidents of default.

Article 6 contains of the Standard Form contains a provision for "Dispute Resolution—Mediation and Arbitration." Article 7 includes waivers for damages not covered by property insurance. These provisions of the subcontract and others may have application to Mr. Riley's actions in this case, including his testimony regarding a fear of being sued by Knight if he did not include architect fees in the claim.[4]

### SUMMARY

We have not found that Riley had actual knowledge of the truth or falsity of its claim regarding the fees for Knight. A false claim need only be "knowing," however. 31 U.S.C. § 3729(b). "Knowing" includes deliberate ignorance and reckless disregard of the truth or falsity of information submitted, in addition to actual knowledge. *Id.* The legal distinction between these terms under the False Claims Act is narrow at best.

The legal standard that may apply is "reckless disregard." This has been defined in the case law as something more than gross negligence, or "gross negligence plus." One court defined it as "an extreme version of ordinary negligence." *United States v. Krizek,* 111 F.3d 934, 942 (D.C.Cir.1997). Mr. Riley could have been more diligent in assessing the nature of his liability to Knight before attempting to charge it to the Government, but other elements of his cost analysis are rather crudely compiled as well. We do not have evidence of the extent to which Mr. Douglas assisted in putting the claim together. Mr. Riley would have had reason to rely on Douglas, the former Navy ROIC, as an expert in submitting claims. Such reliance, if it exists, may be relevant in considering the various counterclaims.

We must deny the parties' cross-motions for summary judgment on the record as it now stands. Some remaining issues may be legal, but some depend on factual findings that we cannot make without additional evidence and testimony. Several proposed fac-

---

4. Mr. Riley explained, "[m]y thinking at the time [that Riley filed the claim] was, if I submit a claim to the government, and if ... I left Knight

out, now am I going to be facing litigation from them saying that, you didn't compensate us for our losses ...."

tual findings and legal/factual issues are listed below for consideration by counsel in preparing for trial or for settlement:

1. Did the design contract between Knight and Riley authorize a higher fee based on additional construction? The design contract seems to fix Knight's fee at $353,939. The fee might have been *based* on a percentage of construction costs—a starting point—but the testimony did not show that Knight's fee would *be* six percent of the total cost of construction. See, however, the design contract terms cited above.

2. Could Riley have been liable to Knight for additional fees under the design contract? The contract states in part, "compensation shall be as follows: Fixed amount of $353,939." Had the Navy doubled the size of the Fleet Store as originally designed, would Knight have had no recourse? If not, did Mr. Riley make a mistake of law in interpreting the design contract? Would a mistake of contract law have implications for the court's application of the counterclaims?

3. Mr. Riley maintained that Riley's relationship with Knight was a special one, that they were partners who were not the normal prime-sub but a "design-build team." However, Riley did not share its $900,000 gross profit on the Fleet Store project with Knight as a partner might. Knight worked for a fee that was independent of Riley's profit. Their relationship was not significantly different from that of any prime and its sub. The business relationship between Riley and Knight ultimately is irrelevant because the Navy contracted only with Riley. Mr. Riley signed the contract with the Navy as Division Manager/Corporate Treasurer of Riley Construction Company.

4. Mr. Riley testified that the claim is not a request for additional costs incurred or projected, but an estimate of the contract price that Riley believed to be fair given the larger size of the Fleet Store. If so, was this approach unreasonable, given the nature of the Fleet Store project and the unusual circumstances that created the confusion? Riley filed its claim for expected additional architecture and engineering fees after the Fleet Store project was complete. Could it reasonably have anticipated additional fees in such circumstances?

5. Knight spent 437 more hours on the design phase than budgeted. Mr. Sirgo recalled disclosing to Riley that Knight was spending additional time on the project design, but apparently did not know how much additional time. Mr. Sirgo seemed uncertain at the hearing. Riley did not know how much time additional time Knight spent on the footprint issue, however, or even that Knight was spending more time on the project than budgeted.

## CONCLUSION

The parties' cross motions for summary judgment are DENIED. Counsel will meet as soon as possible to discuss the effect of this Order and Opinion on the remainder of the case. If they find that resolving this matter without further litigation is unlikely, they will notify the court no later than May 6 to schedule a trial on remaining issues. The parties may contact the court at any time to seek assistance with settlement, or any other matter.